UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

WILLIAM BRIAN THURLBY          )
                               )
              Petitioner,      )
v.                             )          3:06-cv-462
                               )          *Phillips*
                               )
DAVID MILLS, Warden,           )
                               )
              Respondent.      )

## **MEMORANDUM**

This is a petition for the writ of habeas corpus, as amended, pursuant to 28 U.S.C. § 2254, filed by petitioner Brian William Thurlby[1] ("petitioner").  The matter is before the court on the answer to the petition filed by the Tennessee Attorney General on behalf of the respondent and petitioner's response thereto.  For the following reasons, the petition for the writ of habeas corpus will be **DENIED** and this action will be **DISMISSED WITH PREJUDICE**.

---

[1]On direct appeal, the Tennessee Court of Criminal Appeals referred to petitioner as William Brian Thurbley:  "We note that numerous variations of the defendant's last name appear throughout the record, from Thurlby to Thurbly to Thorlby.  Because the defendant's name is spelled 'Thurbley' in the first indictment, we will use that spelling in this opinion."  *State v. Thurbley*, 1999 WL 301591 at *1 n.1 (Tenn. Crim. App. May 11, 1999).  In post-conviction proceedings, and in this court as well, petitioner has used the last name of "Thurlby."

I.    Standard of Review

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Cases In The United States District Courts, the court is to determine, after a review of the answer and the records of the case, whether an evidentiary hearing is required. If no hearing is required, the district judge is to dispose of the case as justice dictates. If the record shows conclusively that petitioner is not entitled to relief under § 2254, there is no need for an evidentiary hearing and the petition should be denied. *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986).

II.   Factual Background

The respondent has provided the court with copies of the relevant documents as to petitioner's direct appeal and post-conviction proceedings. [Court File No. 18, Notice of Manual Filing of Documents, Addenda 1-17]. Petitioner was convicted by a jury in the Circuit Court for Sevier County, Tennessee, of the premeditated murder of Tony Desanto as well as felony murder committed in the perpetration of a kidnapping. He was sentenced to life in prison for each conviction; the trial court merged the two convictions into one judgment of life imprisonment. The conviction was affirmed by the Tennessee Court of Criminal Appeals on direct appeal. *State v. Thurbley*, 1999 WL 301591 (Tenn. Crim. App.

May 11, 1999) [Addendum 5], *permission to appeal granted, id.*, (Tenn. December 11, 1999) [Addendum 8].

The Tennessee Supreme Court granted the application for permission to appeal for the sole purpose of remanding the matter to the trial court for correction of the record.

> The defendant was charged in separate indictments with premeditated murder and felony murder for the killing of one individual. The jury found the defendant guilty on both indictments, and the trial court sentenced the defendant to life imprisonment. In reviewing the record, this Court found that the trial court entered two judgment of conviction of first-degree murder based upon the jury's two guilty verdicts, one for premeditated murder and one for felony murder. Although the trial court's judgment on the felony murder conviction states that the life sentence imposed on that conviction merges with the life sentence imposed on the premeditated murder conviction, it was error for the trial court to enter two separate judgments of conviction for the first-degree murder of one individual.

> Pursuant to Rule 52(b), Tenn. R. Crim. P., the application is hereby granted for the limited purpose of remanding the case to the trial court. In all other respects, the application is denied. The case is hereby remanded to the trial court for correction of the record. The trial court shall enter a single judgment of conviction stating that the defendant is guilty of the offense of first degree murder; the judgment shall state that the jury found the defendant guilty of premeditated murder and of felony murder.

*State v. Thurbley*, No. 03c01-9709-CC-00414 (Tenn. Dec. 13, 1999) [Addendum 8].

On direct appeal, petitioner challenged the sufficiency of the evidence against him as well as alleged errors on the part of the trial court. In a lengthy summary, the Tennessee Court of Criminal Appeals stated the evidence against petitioner as follows:

> Santo Bimonte testified that he owns Santo's Italian Restaurant in Pigeon Forge. He said that he had known the victim, Tony Desanto, for eight to ten years and that the victim worked for him as a waiter. Mr. Bimonte said that the victim had been experiencing back problems and had been off work for two or three weeks before his death. He described the victim as a

Case 3:06-cv-00462   Document 27   Filed 08/24/11   Page 3 of 31   PageID #: 10

perfectionist and a model employee. He stated that on the Thursday or Friday before the victim's death, he accompanied the victim to Jerry Ward's house because the victim was interested in buying Mr. Ward's truck. Mr. Bimonte said the victim was supposed to work on Friday, but the victim asked for an extra day off because of his back problems. Mr. Bimonte testified that the victim said he would be at work on Saturday at around 4:00 or 5:00 p.m. Mr. Bimonte said he became worried on Saturday when the victim did not show up for work, and he asked a mutual friend, Robert Franklin, to check on the victim. Mr. Bimonte said that when Mr. Franklin could not find the victim, Franklin left a note on the victim's car. Mr. Bimonte stated that he never saw the victim upset, angry or violent. He said the victim always carried a dark gym bag.

On cross-examination, Mr. Bimonte said he did not know that the defendant was a friend of the victim. He said he did not know that the victim sold or smoked marijuana.

Deborah Bimonte testified that she was the dining room manager at her husband's restaurant, and her testimony was substantially similar to her husband's testimony. She stated that the victim was of medium build and was not in very good physical condition. She said the victim was peaceful. On cross-examination, she stated that waiting tables can be physically demanding but that she gave the victim a small station.

Robert Franklin testified that he and the victim had worked together at the Edgewater Hotel. He said that the victim had back problems and that he brought the victim a heating pad the week before the victim died. He said the victim moved slowly and was not muscular. He said that on Saturday, January 20, 1996, Mr. Bimonte called him and told him that the victim had not shown up for work. He said Mr. Bimonte asked him to check on the victim, and he agreed he would. He said that the victim's truck was parked outside his apartment, and he knocked lightly on the apartment door because he thought the victim might be sleeping. He said that when the victim did not answer, he put a note on the door and left. Mr. Franklin said the victim always carried a black gym bag with him that contained magazines and clothes. He said he never saw the victim act violently.

On cross-examination, Mr. Franklin said he did not know that the defendant was a close friend of the victim. He said he knew that the victim smoked marijuana and sold it out of his home.

4

Jerry Ward testified that he is a friend of Mr. Bimonte and that he knew the victim from the restaurant. Mr. Ward said that the day before the victim died, the victim came to his house to look at a truck he wanted to sell.

Irene Capiello testified that she lived with Dean Okie in a farmhouse that was converted into apartments and that they were the victim's neighbors. She said the apartment walls were thin, and she could hear from one apartment to another. She said the victim had been experiencing back problems and was off work but was planning to return to work on Saturday. She testified that the weather was very cold on Friday, January 19.

Ms. Capiello testified that the victim did not have a telephone, and he came to her apartment on Friday to call the restaurant and tell them he would not be at work until Saturday. She said she and the victim shared a marijuana cigarette at about 4:45 p.m., and the victim went back to his apartment. She said that after the victim left, she heard a car pull in at about 7:00 p.m. She stated that she may have heard another car pull in and out sometime before 10:45 p.m. but that she never heard any loud noises that night. She said she and Mr. Okie went to bed at about 12:50 a.m. She said that on Saturday, Mr. Okie went to see the victim, but the victim did not answer the door.

Ms. Capiello testified that she never saw any duct tape or commercial laundry bags in the victim's apartment. She said she knew the victim and the defendant were friends. She said the police talked to her on Sunday after the victim's body was discovered in his apartment, and she gave the police the names of the victim's friends, including the defendant. She said she called the defendant and left a message for him, and he called her back on Monday. She said Mr. Okie told the defendant about the victim's death, then she told the defendant that she had given his name to the police. Ms. Capiello testified that the victim was extremely passive and avoided confrontation. She explained that once, a neighbor's dogs were barking loudly and disturbing the victim, but he asked Ms. Capiello if she would talk to the neighbor about it because he did not want to confront the neighbor. She stated that the victim was much smaller than the defendant and was not physically able to fight.

On cross-examination, Ms. Capiello testified that the victim came to her apartment about three times on Friday to use the telephone. She said the victim also helped fix her stove because it was uneven, and the victim had to bend down to do this. She said she saw a blue car pull into the driveway on Saturday night, and she believed a man, woman and child were in the car. She

5

said that if there had been a fight between two grown men in the victim's apartment, she would have heard it. She stated that the defendant had always been polite and mannerly toward her.

On redirect examination, Ms. Capiello testified that about three months before the victim's death, the defendant came to her apartment. She said the defendant backed her up and put his arms around her, and this made her nervous.

Dean Okie testified that he lives with Irene Capiello. He said he last saw the victim alive on Thursday, January 18, in front of the victim's apartment. He said the victim was going to look at a vehicle, and the victim said he was feeling better. He said the next day, he went to North Carolina at 7:30 a.m. and did not arrive home until 11:30 p.m. He said that when he pulled into the driveway, the victim's truck was there, and a light was on in the victim's apartment. He said that he would have heard people shouting in the victim's apartment because the walls were thin. He said that on Saturday, he awoke at 8:30 a.m. and went to the victim's apartment at 9:00 a.m. He said he knocked on the door, but the victim did not answer. He said the victim's truck was still in the driveway. He said he knocked on the victim's door again at 12:30 p.m., but the victim still did not answer. He said he stayed home all day.

Mr. Okie testified that on Sunday, he told Ms. Capiello that if the victim's truck was still in the driveway when he returned home from work that evening, he would try to find the victim. He said that when he arrived home from work at 5:00 p.m., the victim's truck was in the driveway, and its hood was cool to the touch. He said he banged vigorously on the victim's door, and he saw a note telling the victim to call his place of employment because they were worried. He said he tried to open the door, but it was locked. He said he decided to try to enter through a window on the side of the victim's apartment, and he was able to enter through the spare bedroom window, which was open. He said that when he went into the hallway, he saw the victim's body lying on the floor. He said the body was wrapped in an off-white laundry bag, and the victim's ankles were bound with tape. He said he called 9-1-1. Mr. Okie said the victim was a peaceful person.

On cross-examination, Mr. Okie admitted that he had previously given a statement in which he said he saw the victim on January 19. He said that the date was wrong and that he actually saw the victim on January 18. He said he

occasionally smoked marijuana with the victim. He said he knew the defendant, and he knew that the defendant was a friend of the victim.

Joe Graham testified that he had known the victim for eight years. He said that on Friday, January 19, he went to the victim's apartment at about 7:00 p.m. to pay the victim forty dollars he had borrowed. He said the victim was wearing sweatpants, house slippers and a bathrobe, and he was fixing dinner. He said the victim had been having back problems. He said he paid him the forty dollars, and the victim put the money on the coffee table. He said the victim told him he was going back to work on Saturday. Mr. Graham said he saw a bag containing about twenty joints worth of marijuana underneath the victim's chair in the living room. He said they smoked about one-half of a marijuana cigarette and ate dinner. He stated that the victim's black gym bag was on the couch in the living room. Mr. Graham said he left the apartment at about 9:45 p.m., and on that night, he did not see nor had he ever seen any duct tape or a laundry bag in the victim's apartment. He said the victim was five feet, eight-inches tall and was not muscular. He said the victim was very peaceful. He said he had met the defendant once, and the defendant was much larger than the victim.

Jeff McCarter testified that he is a detective with the Sevier County Sheriff's Department. He said he was dispatched to the victim's apartment on the evening of Sunday, January 21, 1996. He said he found the victim's body lying on its back in the floor of the living room. He said he made a videotape of the scene, and the videotape was played for the jury while Detective McCarter explained what he saw. He said the victim had silver duct tape around his ankles and was wearing sweat pants. He said that from the waist up, the victim was covered by a large, white linen bag. He said the bag was later removed, revealing that the victim's hands were bound by duct tape across the chest, with one arm lying over the other. He said there was a jagged tear or cut in the bag on the opposite side from the victim's face.

Detective McCarter said that each of the victim's legs was individually taped and then taped together. He said the victim's clothes were pulled around his waist, indicating that the victim had been dragged backwards with his feet toward the door. He said the victim's button-up shirt and T-shirt were bundled underneath him. He said the victim's hands were tightly bound, and each arm was bound individually and then together. He said the victim had relatively fresh wounds on his knuckles and hands, abrasions on his nose and face, and

a wound or scratch on the left side of his abdomen. He said there was a clump of hair near the victim, and blood was on a shirt.

Detective McCarter testified that his first contact with the defendant was on the Tuesday following the victim's death. He said he drove into the defendant's driveway, but a vicious dog was outside, and he did not get out of the car. He said that instead, he blew his horn for three to five minutes, but nobody came outside. He said he drove across the street and pulled into a gravel parking lot from which he could observe the defendant's driveway. He said he called Agent Davenport and Captain Larry McMahan and told them what happened. He said they met him in the parking lot, and Agent Davenport called the defendant. He said Agent Davenport spoke with the defendant and told him they were coming to his home. Detective McCarter testified that when they drove across the street to the defendant's home, the defendant was standing in the driveway next to his car and had keys in his hand. He said they explained to the defendant that they were investigating a homicide, and the defendant invited them into his home.

He said that he, Agent Davenport, Captain McMahan, and TBI Agent Steve Richardson accompanied the defendant into his home. He said the defendant mainly talked to Agent Davenport. He said he observed the defendant and noticed that the defendant kept his right hand either underneath him or in his pocket during the conversation. He said that when the telephone rang, the defendant reached out with his right hand, and he noticed that the defendant had fresh scratches on the back of his hand. He said the officers began to leave because the defendant said he had no information about the victim's death, but he and Captain McMahan went back to ask the defendant about the scratches on his hand. He said he examined the back of the defendant's hand and saw two long scratches. He said the defendant explained that briars caused the scratches while he was chopping wood. He said that ten days later, he obtained a search warrant and took photographs of the scratches. He said that by then, the injuries had substantially healed.

On cross-examination, Detective McCarter said that the defendant's friends confirmed that the defendant frequently chopped wood, and he admitted that the defendant's home was in a wooded area. Detective McCarter stated that the defendant came to the detective's office on January 30 and gave a statement. He said the defendant admitted that he was at the victim's apartment on Friday, January 19. He testified that the defendant said the victim started a fight by punching him in the face, knocking off his glasses.

8

The defendant said they engaged in mutual combat, and he eventually found some duct tape in a pile of junk in a corner. The defendant told Detective McCarter that he threw the laundry bag over the victim's head to disorient the victim so he could escape. He told Detective McCarter that he slit the bag to allow the victim to breathe.

Detective McCarter testified that the defendant told him he never punched the victim in the face because he knew the victim was a restaurant worker. He said the defendant told him that his primary goal was to detain and disorient the victim in order to get out of the apartment. Detective McCarter said the victim's hands were taped differently than how the defendant explained it in his statement. He said the defendant stated that he thought the victim was alive and breathing when he left the apartment. He also said the defendant stated that he left the duct tape at the apartment and placed a table upright that had been knocked over during the struggle.

On redirect examination, Detective McCarter testified that the defendant is six feet, three inches tall and weighs two hundred pounds. He said that when he and the other officers first spoke with the defendant at the defendant's home, the defendant refused permission to take photographs of his hands. He said that when the defendant came to the station and made a statement, the defendant said that he walked from his house to the victim's apartment at about 11:30 p.m. on Friday night. He testified that the defendant said that he smoked marijuana with the victim that night, then told the victim he was not going to buy any more marijuana from him. He stated that the defendant said this made the victim angry, and the victim cursed and yelled. He said the defendant told him that the victim went to the kitchen, came back out and threw a rock at him.

Detective McCarter testified that the defendant told him that the victim then got a knife. He stated that the defendant said he knocked the knife away and as they struggled, he saw the duct tape. Detective McCarter said the defendant stated that he got on top of the victim and taped his hands and legs together. He said the defendant told him that the victim's hands were ten inches apart, outstretched and straight over the victim's genital area. Detective McCarter testified that at the scene, the victim's hands were not ten inches apart; rather they were tightly taped together. He said the defendant told him that he screamed for Ms. Capiello about twenty times. He said the defendant told him that once he bound the victim, he turned on the television, turned off the lights and left. He said the defendant stated that the victim was moaning

and breathing shallowly when he left and that he left the apartment door cracked. Detective McCarter testified that at the scene, the table the victim claimed was knocked over during the struggle was standing upright with a coffee cup containing coffee and a cigarette tray containing ashes on top of it.

On recross-examination, Detective McCarter stated that he found several clumps of hair at the scene, and one clump was in the victim's hand. He said that the defendant told him that when he was on top of the victim, the victim grabbed his hair, pulling him back.

Karen Lanning, a forensic examiner with the FBI Trace Evidence Unit, testified that she examined the hair found at the scene, and the hair was consistent with the defendant's hair and inconsistent with all other samples provided to her. She said the defendant's hair was also found underneath the victim. She said that all of the hair found on the victim's clothing came from either the victim or the defendant. She said it looked like the hair from the defendant had been forcibly removed and would be consistent with the victim having pulled the defendant's hair in a struggle.

Dr. Cleland Blake, the Assistant Chief Medical Examiner for Tennessee, testified that he was called to the victim's apartment on January 21, 1996. He said the victim's body was lying on the floor in the same position as when it was discovered. He said he saw a table and a rock collection partially overturned on the floor. He said the victim had a laundry bag over his head and was wearing blue sweatpants. He said that after removing the laundry bag, he saw that the victim's hands and feet were tightly bound with duct tape. He said the hands were crossed, and each hand was taped individually and then bound together tightly. He said that the victim had injuries to his face and knuckles and that the surface skin on his nose, chin and cheeks was rubbed off like an abrasion. He said the victim had free blood around his lips. He said the victim's knuckles and the backs of his hands were bruised, which indicated that his hands had hit a surface.

Dr. Blake testified that the victim had compression abrasions on his neck, which were associated with mild bleeding around the vessels inside the neck. He said the victim had compression fractures on seven of his ribs, and the fractures were consistent with someone jumping or sitting down hard on the victim's chest. He said he found bleeding around the carotid arteries, which was typical of squeezing and compressing the neck. He said the neck showed only abrasions and not significant outside bruises because one generally does

not see bruises if a cloth or padding is used to squeeze the neck. He said the victim's injuries were consistent with choking or squeezing the neck. He determined that the cause of death was compression of the neck which cut off the oxygen supply and caused the victim to asphyxiate. He said the choking would have had to last at least five minutes, and the victim could not have died just from the bag being placed over his head. He said there had to be some compression.

On cross-examination, Dr. Blake testified that he did not examine the duct tape for the presence of teeth marks or saliva. He said he saw hair on the scene, including at least one clump of hair. He said the victim was smothered through the cotton bag, but he did not examine the inside of the victim's nose or his neck area for fibers from the bag. He admitted that in his report, he stated that the neck was symmetrical and unremarkable with no evidence of grasp marks or encircling lines, but he said he meant no marks consistent with strangulation, such as noose marks. He said the victim had external injury in the form of abrasions. He said he found no grasp marks on the neck, but the skin was rubbed off. He said the victim had internal bleeding around the neck vessels which showed that the neck was definitely squeezed. He said the bleeding around the neck was not from a kick or a chop but from progressive choking. He said he believed the choking was done through the cotton bag. He said that because the bag protected the skin, the only visible external injuries were abrasions. He said he could not estimate the time of death, but he could determine that the victim ate no more than one hour before he died. He stated that in his report, he put a question mark next to "compression marks from asphyxiation effort." He said his initial impression was that there was compression through the fabric, and he believes that the compression was the cause of death.

Michael Howard testified that he had worked with the defendant at the Branding Iron. He said the defendant was very calm and peaceful, and he never saw him angry. On cross-examination, he said he had heard that the defendant assaulted his wife on May 17, 1995, by grabbing her throat, kicking her out feet from under her, landing on top of her, and choking her. He said he considered this in forming his opinion about the defendant's reputation for peacefulness. He said he went to the defendant's house after the alleged assault occurred, and the defendant's wife did not look like she had been touched. He said that he had not heard about the same thing happening two days later but that it would not change his opinion of the defendant.

Gary Gray testified that he is the pastor of a local church and owns a vinyl business. He said that he had known the defendant for about five years through church and that they had worked together at the Passion Play. He said the defendant was peaceful and of good character. He said he was at the defendant's house on the afternoon of Friday, January 19, because he wanted to make sure the defendant was keeping ties with Christian people. He said he spent about three hours with the defendant that day. He said he saw the defendant again the following Tuesday or Wednesday, and the defendant took him into his confidence as a pastor. He said he convinced the defendant that he needed to tell the police what happened at the victim's apartment, and he accompanied the defendant to the Sevier County Sheriff's Department on January 30. He testified that at that time, the defendant was smaller than he was at the time of trial, weighing about one hundred and seventy pounds. On cross-examination, he testified that he had not heard about the defendant assaulting his wife on two occasions.

Albert Cissery, Gretchen Cissery, Tom Howard, Sabrina Gray, Joan McGill and Lana Johnson all testified that the defendant was a peaceful person and was of good character. Mr. Cissery and Ms. McGill were asked if they had heard about the defendant assaulting his wife on two occasions, and they said they had not. The jury convicted the defendant upon the foregoing evidence.

*State v. Thurbley*, 1999 WL 301591 at **1-8. The appellate court concluded the evidence was sufficient to support the convictions, *id*. at **8-9, and that the allegations of error lacked merit, *id*. at **10-17.

Petitioner then filed a petition for post-conviction relief, in which he asserted various claims of ineffective assistance of counsel, as well as trial court error and the State's withholding of evidence. The petition was denied after an evidentiary hearing and the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. *Thurlby v. State*, No. E2005-00648-CCA-R3-PC, 2006 WL 18896371 (Tenn. Crim. App. July 10, 2006) [Addendum 15], *perm. app. denied, id.* (Tenn. Nov. 20, 2006) [Addendum 17].

In support of his petition for the writ of habeas corpus, as amended, petitioner alleges the following fifteen (15) grounds for relief, as paraphrased by the court:

1.   The prosecution suppressed exculpatory evidence, namely the victim's death certificate, which would have shown the cause of death was inconsistent with the evidence at trial.

2.   The prosecution suppressed exculpatory evidence, namely the hand-written letter from Irene Capiello to the victim's parents.

3.   The prosecution suppressed exculpatory evidence, namely the criminal history of State's witness Dean Thomas Okie.

4.   The prosecution suppressed exculpatory evidence, namely the supplemental police report of Detective McCarter.

5.   The prosecution suppressed exculpatory evidence, namely the tip the police received from Ricky and Joy Parton.

6.   The prosecution suppressed exculpatory evidence, namely the T.B.I. interview of Robert DeSanto.

7.   The prosecution suppressed exculpatory evidence, namely the statements of Deborah Loveday.

8.   Defective indictments and hidden presentments violated petitioner's right against double jeopardy.

9.   Petitioner was denied effective assistance of counsel based upon a conflict of interest.

10.   Petitioner was denied effective assistance of counsel based upon counsel's lack of pre-trial investigation in failing to read the presentments.

11.   Petitioner was denied effective assistance of counsel based upon counsel's failure to discover and read the victim's toxicological report.

12.   Petitioner was denied effective assistance of counsel based upon counsel's failure to discover and read the victim's death certificate.

13.     Petitioner was denied effective assistance of counsel based upon counsel's failure to move to suppress petitioner's statement to police made while under the influence.

14.     Petitioner was denied effective assistance of counsel based upon counsel's failure to allow petitioner to testify at trial.

15.     Newly discovered evidence shows that petitioner was denied a fair trial.

The respondent contends that petitioner is not entitled to relief because the decisions of the state courts rest on reasonable determinations of the facts and reasonable applications of federal constitutional law, and that any claim not raised in the state courts has been procedurally defaulted.

III.     <u>Procedural Default</u>

The doctrine of procedural default is an extension of the exhaustion doctrine. A state prisoner's petition for a writ of habeas corpus cannot be granted by a federal court unless the petitioner has exhausted his available state court remedies. 28 U.S.C. § 2254. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971). *See also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (Exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review."). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

14

Petitioner cannot file another state petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(c). Accordingly, he has no remedy available to him in the Tennessee state courts for challenging his conviction and is deemed to have exhausted his state remedies.

It is well established that a criminal defendant who fails to comply with state procedural rules which require the timely presentation of constitutional claims waives the right to federal habeas corpus review of those claims "absent a showing of cause for the non-compliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). *Accord Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("We reaffirm, therefore, that any prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief.").

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

IV.   State Court Findings

Pursuant to 28 U.S.C. § 2254(d), petitioner may not obtain federal habeas corpus relief with respect to a claim that was adjudicated on the merits in a state court proceeding unless the state court decision (1) was contrary to, or involved an unreasonable application of, clearly established federal law or (2) was not reasonably supported by the evidence presented to the state court.  In addition, findings of fact by a state court are presumed correct and petitioner must rebut the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e).  Petitioner has failed to rebut, by clear and convincing evidence, the findings of the state courts and they will be presumed correct by this court.

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), clarified the distinction between a decision "contrary to," and an "unreasonable application of," clearly established Supreme Court law under § 2254(d)(1).  A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Id*. at 413.  A state court decision "involves an unreasonable application of clearly established Federal law" only where "the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 409.  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

16

incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. In light of the foregoing, the court will consider petitioner's claims for relief.

V.    Discussion of Claims

*A.  Suppression of Exculpatory Evidence*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Impeachment evidence as well as exculpatory evidence "falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *Bagley*, 473 U.S. at 682). *See also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.").

Petitioner alleges the prosecution suppressed seven items of exculpatory evidence: (1) the victim's death certificate, (2) the hand-written letter from Irene Capiello to the victim's

17

parents, (3) the criminal history of witness Dean Thomas Okie, (4) the supplemental police report of Detective McCarter, (5) the tip the police received from Ricky and Joy Parton, (6) the T.B.I. interview with the victim's brother, Robert DeSanto, and (7) the statements of Deborah Loveday. From a review of the record, it is clear that all but one of these claims of suppressed evidence have been procedurally defaulted.

In his amended post-conviction petition filed by counsel, petitioner alleged the following:

> The Office of the District Attorney General for the Fourth Judicial District failed to provide exculpatory evidence to the Petitioner, in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963). Likewise, certain evidence, which should have been provided to the Petitioner prior to trial, pursuant to *Rule 16*, of the *Tennessee Rules of Criminal Procedure*, was withheld. upon request, the Petitioner will provide a bill of particulars in connection to this charge.

[Addendum 9, Technical Record on Appeal, Amended Petition for Relief from Conviction, p. 51, ¶ 15].

In a supplement to the amended petition, petitioner alleged:

> Further, on August 23, 2004, counsel for the Petitioner appeared at the Office of the District Attorney General for the Fourth Judicial District, in order to photocopy the Assistant District Attorney General's file. A review of the contents of that file reveal that the Defendant was not provided material exculpatory information, which was in the possession of that office prior to trial. The Petitioner has found a document, which was apparently drafted by Assistant District Attorney General Steve Hawkins, which provides, "Dean Okie stole – he wouldn't be one to call and find body – let Irene [Capiello] do it – let someone else do it – never admit being in apartment along and finding body." Further, the file reveals that a polygraph examination was administered to Mr. Dean Okie on April 22, 1996, and that the following exchange occurred at question numbered [sic] 7: "Other that [sic] what you told me, did you take anything from Tony [DeSantos'] apartment after his death (before the police came)?" The polygraph examiner's name is Ray Presnell. This exculpatory

evidence was not disclosed to the Defendant, as is mandated by *Brady v. Maryland*, 373 U.S. 83 (1963), *State v. Black*, 745 S.W.2d 302 (Tenn. Crim. App. 1987) or the Due Process guarantees contained in *Article I, § 8* of the *Tennessee Constitution*, or *Amendments 6* and *14* of the *United States Constitution*.

Likewise, other evidence, exculpatory in nature, was not revealed to the Defendant, including, but not limited to, the Death Certificate, the Interview with Robert DeSantos, the photograph of Irene Capiello and the victim, the letter that Irene Capiello sent to the victim's father, and erroneous reports generated from the T.B.I. which provided that the Petitioner was charged with Second Degree Murder, and that the Petitioner was afforded a preliminary hearing. Further, records indicate that the Petitioner was arraigned with counsel present. Such was not the case, despite the fact that the Petitioner had retained counsel.

[*Id*., Supplement to Amended Petition for Relief from Conviction, p. 68].

At the conclusion of the evidentiary hearing, the trial court made oral findings of fact and conclusions of law, and specifically found "There is no evidence in this record of any Brady violations ...." [Addendum 10, Transcript of Post-Conviction Evidentiary Hearing, vol. 2, Findings and Conclusions of the Trial Court, p. 178]. On appeal from the denial of post-conviction relief, the petitioner raised only four claims of suppression of evidence: the death certificate [Addendum 11, Brief of the Appellant, p. 96], the letter from Irene Capiello [*id*. at 95], the supplemental police report of Detective McCarter [*id*. at 91], and the tip from the Partons [*id*. at 89-90].

Petitioner's claims that the criminal history of Dean Okie and the statements of Deborah Loveday were suppressed were never raised in the state courts and thus have been defaulted. Although the claim that the prosecution suppressed the T.B.I. interview of Robert DeSanto was presented in the amended petition for post-conviction relief, it was not raised

19

on appeal and thus has been defaulted. In addition, although petitioner briefed on appeal the claim that the supplemental police report of Detective McCarter was suppressed, the report was not entered into evidence and thus that claim has been defaulted.

> The petitioner complains that the State suppressed "the [s]upplement from Detective McCarter, which provided a wealth of information." Although what purports to be a copy of this supplement is contained in the appendix to the petitioner's brief, it was not entered into evidence during the hearing. Accordingly, it is not properly before this court and cannot be considered. Further, in his questioning of trial counsel, the petitioner did not explore the "wealth of information" to establish how it would have benefitted the defense. This claim is without merit.

*Thurlby v. State*, 2006 WL 1896371 at \*17.

The same was true of the alleged letter from Irene Capiello to the victim's parents -- it was not entered into evidence and thus that claim has been defaulted.

> The petitioner argues that the State suppressed "a letter written by 'Irene and Dean' [which] surfaced after [the] trial, [and] which provided that one of these individuals was 'grateful for the time I spent with [the victim] the day of his death." Although a copy of what purports to be this letter is contained in the appendix to the petitioner's brief, it was not entered into evidence and, therefore, is not properly before this court. Accordingly, we cannot consider this claim. Further, the petitioner has not shown how this letter would have been material to the defense or suggested why it was admissible.

*Id*. at \*18.

With respect to the victim's death certificate, petitioner claims that the evidence at trial was that he killed the victim by placing a cloth bag over the victim's head and suffocating him, despite the fact that the bag had a slit in it. According to petitioner, the death certificate states that the victim was found with duct tape over his nose and mouth, and that is what asphyxiated him. Petitioner contends that, had the jury known of the death certificate, they

would not have found him guilty because he never admitted to putting duct tape over the victim's nose and mouth.

As noted previously, in his supplement to the amended post-conviction petition, petitioner alleged that the prosecution suppressed evidence of the death certificate. During the post-conviction evidentiary hearing, however, when petitioner's counsel raised this issue, it was agreed that the death certificate was a public record. [Addendum 10, Transcript of Post-Conviction Evidentiary Hearing, vol. 1, pp. 26-27]. As a public record, the death certificate would have been available to the defense without disclosure by the State.

Petitioner's trial counsel, when asked during the post-conviction hearing whether he had ever seen the victim's death certificate, answered that he could not recall. [*Id.*, vol. 2, p. 150]. He admitted that the reference in the death certificate to duct tape over the victim's nose and mouth was contrary to Dr. Blake's testimony, and was something he could have used at trial. [*Id.* at 150-51]. In his brief on appeal from the denial of post-conviction relief, petitioner raised this issue in the context of ineffective assistance of counsel. [Addendum 11, Brief of the Appellant, pp. 70, 96].

It is clear that petitioner abandoned his claim that the prosecution withheld evidence of the victim's death certificate and thus that claim was also defaulted. Accordingly, the court will consider only that claim that was properly exhausted, specifically that the prosecution suppressed evidence of the tip from the Partons.

Petitioner claims that suppression of evidence of the Partons' tip deprived him of a valuable avenue of investigation. The trial court noted that the Partons did not testify at the

evidentiary hearing and thus it was not possible to know the substance of the tip. [Addendum 10, Transcript of Post-Conviction Evidentiary Hearing, vol. 2, Findings and Conclusions of the Trial Court, pp. 178-79]. The Tennessee Court of Criminal Appeals agreed.

> When shown the note referring to a "tip" and listing the names Ricky Parton and wife, Joy Parton, with the cryptic phrase, "429-0313 does not work," trial counsel said he "never saw it." Post-conviction counsel then questioned trial counsel about this note by saying, "And Mr. and Mrs. Parton could have said maybe that Steve Hawkins did or that he did it, you know, somebody else besides [the petitioner]." However, since neither Mr. nor Mrs. Parton testified at the hearing, the record contains no evidence as to what relevant information, if any, they might have had. We note that the petitioner, in speculating that they might have testified that someone other than the petitioner killed the victim, fails to take into account his statement to Detective McCarter that he, himself, had bound the victim's hands and feet and placed a laundry bag over his head.

*Thurlby v. State*, 2006 WL 1896371 at *17. The court thus concluded there was no *Brady* violation.

Petitioner has failed to demonstrate that the tip from the Partons was material and that its disclosure would have altered the outcome of the proceedings. Accordingly, the state courts' determinations that suppression of the tip was not a *Brady* violation were supported in the record and were neither contrary to, nor did they involve an unreasonable application of, federal law. Petitioner is not entitled to relief on this claim.

## B. Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984) the Supreme Court established a two-part standard for evaluating claims of ineffective assistance of counsel:

22

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id*. at 687.

To establish that his attorney was not performing "within the range of competence demanded of attorneys in criminal cases," *McMann v. Richardson*, 397 U.S. 759, 771 (1970), petitioner must demonstrate that the attorney's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. at 687-88. In judging an attorney's conduct, a court should consider all the circumstances and facts of the particular case. *Id*. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A finding of serious attorney incompetence will not justify setting aside a conviction, however, absent prejudice to the defendant so as to render the conviction unreliable. *Id*. at 691-92.

Petitioner alleges six instances of ineffective assistance of counsel: (1) conflict of interest, (2) lack of pretrial investigation in failing to read the presentments, (3) failure to discover and read the victim's toxicological report, (4) failure to discover and read the victim's death certificate, (5) failure to move to suppress petitioner's statement, and (6)

refusal to allow petitioner to testify. From a review of the record, it is clear that several of these claims have been procedurally defaulted.

In his original *pro se* petition for post-conviction relief, petitioner alleged many instances of ineffective assistance of counsel. [Addendum 9, Technical Record on Appeal, Petition for Post-Conviction Relief, pp. 5-9]. A number of those were discussed during the evidentiary hearing. On appeal from the denial of post-conviction relief, however, petitioner raised only three of the instances of ineffective assistance of counsel that he now alleges in this court: lack of pre-trial investigation vis-a-vis the presentments [Addendum 11, Brief of the Appellant, pp. 68-69], failure to discover and read the victim's death certificate [*id*. at 70], and refusal to allow the petitioner to testify [*id*. at 83].

Because the remaining claims of conflict of interest, failure to discover and read the victim's toxicological report, and failure to move to suppress the petitioner's statement were not raised on appeal, they have been procedurally defaulted. Accordingly, the court will consider only those claims that were properly exhausted.

The court notes that the Tennessee Court of Criminal Appeals observed that *Strickland v. Washington*'s two-prong test is the standard for considering ineffective assistance claims. *Thurlby v. State*, 2006 WL 1896371 at *9. The appellate court agreed with the trial court that petitioner had failed to demonstrate ineffective assistance of counsel.

In doing so, the appellate court first noted:

[T]he petitioner consistently fails to recognize in his various complaints that, against the advice of counsel, he gave a statement to law enforcement officers, creating a problem for his trial counsel, as the post-conviction court explained:

[Y]ou do what you can with what you've got. Every defense lawyer, including yours truly, has been in cases where not only were the facts against you but the law was against you. That was what happened to [trial counsel] in this case. This defendant had basically admitted to every fact necessary to constitute the crime charged except for the actual killing. That happened long before [trial counsel] got in the case and it happened, not on [pre-arrest counsel's] advice but on the advice of this defendant's pastor. Neither of these attorneys caused that to happen.

The petitioner, in his numerous and diverse claims of ineffective assistance of counsel, also fails to recognize that much of the strength of the State's case against him resulted from his ignoring the instructions of pre-arrest counsel and giving a statement to law enforcement officers, admitting that he taped the victim's hands and feet and placed a bag over his head but did so in self-defense. The careful taping of the victim's hands and feet, immobilizing him, and the fact that he had been strangled belie the petitioner's claims that he was attempting only to subdue the victim so that he could escape. The petitioner does not suggest a trial strategy or theory which would have bridged his self-defense claim with the incompatible manner of the victim's death.

*Id*. at *10.

In considering petitioner's claim that counsel failed to conduct pre-trial investigation, which included his claim that counsel failed to discover the death certificate, the appellate court concluded those claims lacked merit.

The petitioner makes the conclusory allegations, in asserting trial counsel was ineffective as to his pretrial efforts, that "relatively nothing was done to prepare for trial; thus, the services rendered were not within the range of competence of attorneys in criminal cases." As we understand, the specific claims as to trial counsel's allegedly deficient pretrial preparation are that had the pretrial motions been argued before the morning of trial, counsel might have "realize[d] that he was defending not one, but two counts of murder," those being first degree premeditated murder and felony murder; counsel failed to notify the petitioner that he had been charged with felony murder or provide him with a copy of the presentment charging him with the offense; and counsel failed to obtain a copy of the victim's death certificate, which, according to the petitioner, "contained very useful errors in connection to the victim's cause of

25

death." The petitioner has failed to allege, much less show, that any of these claimed shortcomings affected the outcome of the trial and, thus, prejudiced him. Accordingly, the record supports the post-conviction court's finding that this claim is without merit.

*Id.* at *11.  As to the two murder charges, the appellate court specifically noted that "[i]n response to questioning from the post-conviction court, trial counsel said he knew that the petitioner was being tried for first degree premeditated murder and felony murder." *Id.* at *8.

With respect to the claim that petitioner was denied the right to testify, the Tennessee Court of Criminal Appeals stated:

> As we understand the petitioner's claims in this regard, they are that trial counsel "just told [him], you are not going to testify, that's that." However, trial counsel testified that the petitioner made the decision not to testify:
>
> > Q.      Did you talk to him about him testifying in this case?
> >
> > A.      I know we did. The specific times that we did, I can't tell you. Did I tell him you will not testify, no, I didn't. My advice, under the circumstances of the case, would have probably been not to take the witness stand because the defense was that he went to his preacher, they discussed what happened and they wanted to go tell the truth and that's what he did and his story was going to be told through that statement. An [sic] basically there wasn't anything in that statement that he'd have any problem with. He said that's what happened. And that would have been my advice, that you can't do anything but hurt yourself by testifying. But ultimately, [it] always come[s] down to the last witness, I tell my client, you have the opportunity to testify and it's your decision.

*Id.* at *15.

Petitioner also argued to the state courts that his attorney was ineffective by advising him not to testify.  The appellate court rejected such a contention: "This argument overlooks

the fact that trial counsel testified it was the decision of the petitioner that he not testify. Further, we note that while the petitioner hinted that he could provide an apparently more benign explanation of what transpired between him and the victim, he did not suggest what this might have been." *Id*. at *16.

The conclusions of the state courts are supported in the record. Petitioner testified at the evidentiary hearing that "I was just told, you are not going to testify, that's that." [Addendum 10, Transcript of Post-Conviction Evidentiary Hearing, vol. 1, p. 80]. Trial counsel, however, testified that he and petitioner discussed whether petitioner should testify, that counsel advised against it, but in the end it was petitioner's decision. [*Id*., vol. 2, pp. 136-37]. The state courts accredited the testimony of trial counsel that petitioner was advised of his right to testify but also advised to not testify, and that it ultimately was petitioner's choice. Trial counsel also testified that he was aware prior to the day of trial that petitioner was being tried for both premeditated murder and murder in the perpetration of a kidnapping. [*Id*. at 137-38].

Trial counsel testified that he did not recall having seen the victim's death certificate. [*Id*. at 150]. As noted previously, counsel admitted that the reference in the death certificate to duct tape over the victim's nose and mouth was contrary to Dr. Blake's testimony, and was something he could have used at trial. [*Id*. at 150-51]. Nevertheless, the state courts found that petitioner had failed to demonstrate how counsel's failure to discover the death certificate affected the outcome of the proceedings and thus the claim of ineffective assistance of

counsel in that regard lacked merit. This court agrees, given the totality of the evidence against petitioner, including his own inculpatory statement to the police.

As the Sixth Circuit has observed, "our role on habeas review is not to nitpick gratuitously counsel's performance. After all, the constitutional right at issue here is ultimately the right to a fair trial, not to perfect representation." *Smith v. Mitchell*, 348 F.3d 177, 206 (6th Cir. 2003). Under the circumstances, petitioner received "constitutionally adequate representation." *Pillette v. Berghuis*, 408 F. App'x 873, 891 (6th Cir. 2010).

Based upon the foregoing, this court concludes that the state courts' determinations that petitioner received the effective assistance of counsel were neither contrary to, nor did they involve an unreasonable application of, federal law as established by the Supreme Court in *Strickland v. Washington*. Petitioner is not entitled to relief on this claim.

### C. Hidden Presentments / Double Jeopardy

As best this court can tell, in this claim petitioner alleges that there was a prepared presentment for felony murder that was never presented and that the second corrected presentment under which he was charged and convicted of felony murder constituted double jeopardy. This claim was not raised in the state courts and thus is defaulted in this court.

To the extent petitioner may be alleging it was error to convict him of both first degree murder and felony murder, any claimed error was corrected by the Tennessee Supreme Court as a matter of state law.

28

The petitioner argues that the State did not elect between the offenses for which he was indicted, resulting in his being convicted of both first degree premeditated murder and felony murder. Additionally, in this regard, he argues that even though the trial court subsequently entered an order merging the two convictions, as directed by our supreme court, "that [order] had no effect on the piecemeal deliberation that surely resonated among jurors as they considered both charges."

As the petitioner recognizes, he stands convicted of only one offense. His argument, as we understand it, that the jury's verdicts were affected by the fact it was considering two homicide indictments, is based upon nothing other than speculation. The problem with this argument is that, on direct appeal, our supreme court merged the petitioner's convictions for first degree premeditated murder and first degree felony murder. Accordingly, as we understand this issue, it was resolved on direct appeal.

*Id*. at *18.

Because this was decided as a matter of state law, it "is not cognizable in a federal habeas corpus proceeding." *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."); *Sinistaj v. Burt*, 66 F.3d 804, 807 (6th Cir. 1995) ("Errors of state law alone cannot form the basis of relief under federal habeas corpus.").

## D. Newly Discovered Evidence / Actual Innocence

Petitioner claims that newly discovered evidence demonstrates his actual innocence. The Supreme Court, however, has not held that a free-standing claim of actual innocence can warrant habeas corpus relief. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993). Instead, a showing of innocence may be a "gateway" to consideration of an otherwise procedurally barred constitutional claim. *Id*. at 404. *See Schlup v. Delo*, 513 U.S. 298 (1995). "'[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.'" *Id*. at 321 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Petitioner has failed to make a credible showing that he is actually innocent of the crime for which he was convicted and thus he cannot raise his claims of newly discovered evidence.

## VI.  Conclusion

The petition for habeas corpus relief will be **DENIED** and this action will be **DISMISSED**. Rule 4 of the Rules Governing Section 2254 Cases In The United States District Courts. Petitioner having failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**. 28 U.S.C. § 2253(c); Rule 22(b) of the Federal Rules of Appellate Procedure. The court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See*

Rule 24 of the Federal Rules of Appellate Procedure. The court will further **DENY** petitioner leave to proceed *in forma pauperis* on appeal.

## AN APPROPRIATE ORDER WILL ENTER.

_____s/ Thomas W. Phillips_____
United States District Judge
